**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EVERYTHING BASEBALL LIMITED, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5526 |
| | ) | |
| TEAM ATHLETIC GOODS, INC., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Thomas Serewicz and Sam Gallucci invented and patented a baseball chest protector that incorporates shoulder guards to protect the top and back areas of a catcher's shoulders from deflected baseballs. Plaintiff Everything Baseball Limited, LLC ("EBL"), the assignee of the patent, U.S. Patent No. 6,161,226 (the "'226 Patent"), charges Defendant Team Athletic Goods, Inc. ("TAG"), a major supplier of baseball chest protectors, with selling chest protectors that infringe the '226 Patent. The parties have submitted *Markman* briefs, presenting their respective interpretations of claim language in the single claim of the '226 Patent. Following is the court's construction of that claim.

## <u>BACKGROUND</u>[1]

### A.      Conception of the Invention

Chest protectors are used by baseball catchers to protect their bodies from being struck by

---

[1]      The background presented here is drawn from the '226 Patent itself and from the materials attached to the parties' *Markman* briefs. Both parties' briefs include factual assertions more appropriately directed to issues of patent validity, infringement, and inequitable conduct. The court will confine its discussion of the facts to those relevant to claim construction.

Plaintiff's Opening Brief in Support of Its Claim Interpretation of U.S. Patent No. 6,161,226 is cited here as "Pl.'s Br." Defendant's Proposed Claim Construction of Disputed Claim Terms and Response to Plaintiff's Opening Brief is cited as "Def.'s Br." Plaintiff's Reply to Defendant TAG's Response to Plaintiff's Proposed Claim Interpretation of U.S. Patent No. 6,161,226 is cited as "Pl.'s Reply." Team Athletic Goods, Inc.'s Sur-Reply is cited as "Def.'s Sur-reply."

"foul tips" and otherwise deflected baseballs.[2]  In August 1999, Serewicz, a Little League coach in Wasco, Illinois, noticed that the chest protector worn by his catcher did not fully protect the shoulder area.  (Serewicz Aff. ¶ 4, Ex. C to Pl.'s Br.)  Specifically, balls deflected from the bat or off of the catcher's helmet struck the top and rear portions of the catcher's shoulders, which were left exposed by the chest protector, causing severe pain and bruising.  (*Id.*; Serewicz Dep., Ex. 5 to Def.'s Br., at 11-12.)  Collaborating with Gallucci, a longtime baseball instructor and coach who had started the Wasco Little League in 1987, Serewicz conceived of a chest protector that incorporated shoulder guards that curved over the catcher's shoulder.[3]  (Serewicz Aff. ¶¶ 3-5.)  Serewicz built a prototype, using plastic shoulder guards he cut from a piece of used hockey equipment and attached to an existing chest protector with rivets.  (Serewicz Dep., at 18.)  Serewicz and Gallucci filed an application for a patent on their invention on September 15, 1999, ('226 Patent, Ex. A to Pl.'s Br.), and in July 2000 executed an assignment of their patent rights to Plaintiff EBL, an Illinois limited liability company that Serewicz and Gallucci had formed shortly before.[4]  *See* Order of August 16, 2007, Dkt. No. 76.  The '226 Patent issued on December 19, 2000.  ('226 Patent.)

**B.    The Claim and Specification of the '226 Patent**

The '226 Patent, titled "Baseball Chest Protector," sets forth a single claim:

1.    A baseball chest protector comprising:

---

[2]    In his deposition, Trevor Swangard, TAG's president and himself a former professional baseball player, referred to catchers' chest protectors and other equipment as "tools of ignorance."  Though Swangard himself has played catcher on occasion, he observed that "you weren't very smart to get behind" the plate.  (Swangard Dep., Ex. E to Pl.'s Br., at 11.)

[3]    Although the parties dispute the extent of Gallucci's involvement in the invention of the chest protector claimed by the '226 Patent, the dispute is not relevant to claim construction.

[4]    The assignment executed by Serewicz and Gallucci in fact lists Everything Baseball Limited, *Ltd*. as the assignee.  TAG moved to dismiss this action on this basis, contending that Plaintiff—Everything Baseball Limited, *LLC*—lacks standing.  The court denied the motion, concluding that the inventors clearly intended to assign their interests to Everything Baseball Limited, LLC, rather than to the non-existent entity listed in the assignment document, and construed that document accordingly.  *See* Order of August 16, 2007.

a flexible main pad having a left shoulder portion, a right shoulder portion, a chest portion, and an abdomen portion;

a flexible shoulder guard extending from the left shoulder portion of the main pad over the shoulder of a wearer and having a front portion adjacent the main pad, a top portion, and a back portion; and

adjustable straps, each adjustable strap attached at one end to the abdomen portion of the main pad and at the other end to the back portion of the shoulder guard.

('226 Patent, col. 4, ll. 2-12.)

In the patent's written specification, the inventors provided a background and a summary of their invention, identifying problems with existing chest protectors and the ways in which their invention addressed those problems; five drawings, portraying an embodiment of the chest protector from different perspectives; and a detailed description of the preferred embodiment of the invention, with references to the drawings. In the background section, Serewicz and Gallucci explained that existing, "conventional" chest protectors were designed to protect the front of the catcher's upper body without restricting mobility. (*Id.* col. 1, ll. 9-11.) In addition, the protectors then in use utilized adjustable straps, arranged on the back of the protectors, to enable the protector to be worn by different individuals. (*Id.* col. 1, ll. 12-14.) This design resulted in two problems that the inventors sought to solve. First, when the protector was "properly fitted," only the front portion of the shoulder area was protected; the top of the shoulder was unprotected, resulting in catchers frequently being struck on the top of the shoulder by stray balls. (*Id.* col. 1, ll. 15-20.) Second, if the protector was not properly adjusted, it might "sag" and thus expose an even greater portion of the shoulder area. (*Id.* col. 1, ll. 20-22.)

The inventors claimed that their chest protector addressed these disadvantages by incorporating "shoulder guards." (*Id.* col. 1, ll. 26-27.) Summarizing the invention, they explained that the shoulder guards "are of lightweight material, such as the material used for other portions of the chest protector, and they may be integrally formed with the chest protector, or they may be separately manufactured and attached to the chest protector." (*Id.* col. 1, ll. 30-35.) The shoulder guards "should extend just slightly outward of the wearer's shoulder," so the shoulder would be

protected but the catcher's mobility not impaired. (*Id.* col. 1, ll. 34-37.) In addition, the inventors stated that their chest protector "should rest on the wearer's shoulders, ensuring that the protector is properly positioned even when the straps are not perfectly adjusted." (*Id.* col. 1, 38-41.)

In their description of the preferred embodiment and the drawings referenced therein, the inventors provided a more detailed example of their invention. The "main pad" would be similar to that of existing chest protectors in the materials used for its construction, and in the fact that it would have a "shoulder portion" on each side; in the drawings, each "shoulder portion" of the main pad extends up the front part of the wearer's shoulder and only slightly curves over the top part of the shoulder. (*Id.* col. 2, ll. 13-15 & fig. 2.) The shoulder guards—not to be confused with the "shoulder portions" of the main pad—curve over each of the wearer's shoulders, and may either be "integrally formed as part of the main pad" or may consist of separate pieces attached with "suitable fastening means such as rivets or snaps" to the shoulder portions of the main pad. (*Id.* col. 2, ll. 45-49 & fig. 4.) The preferred embodiment contains the following description of the shoulder guards, which is at the heart of the parties' dispute over the proper interpretation of several key claim terms:

> The shoulder guards should be relatively rigid so that they maintain a "U" or "J" shape . . . but they should remain flexible enough to be comfortable to wear. The guards are, therefore, preferably made of plastic or any other material that is sufficiently rigid to maintain a "U" or "J" shape but that is flexible enough for comfort.

(*Id.* col. 2, ll. 31-38.) In addition, the "front portion" of the shoulder guards in the preferred embodiment extends from the top of the shoulder portion of the main pad to the top of the wearer's shoulder; the "top portion" of the shoulder guards "curv[es] over the wearer's shoulder"; and the "back portion" extends "down a portion of the wearer's back such that the shoulder is covered." (*Id.* col. 2. ll. 38-43.) Finally, the inventors stated that the "adjustable straps" in the preferred embodiment "may be made of leather or other suitable material." (*Id.* col. 3, ll. 1-2.)

## C. Prosecution History

The Patent and Trademark Office ("PTO") rejected Serewicz's and Gallucci's application once before issuing the patent. On February 29, 2000, the Examiner rejected Claim 1 (the only claim) of the '226 invention as anticipated or rendered obvious by the "Siemens" patent, U.S. Patent No. 5,204,993. (Detailed Action, Ex. 10 to Def.'s Br.) The Siemens patent disclosed a rigid chest protector, for use by hockey goalies, that included shoulder coverings.[5] ('993 Patent, Ex. 9 to Def.'s Br.) In response, Serewicz and Gallucci amended Claim 1 to add the adjective "flexible" to modify the claimed main pad and shoulder guards. (Amendment, Ex. 11 to Def.'s Br.) In their argument to the Examiner, the inventors noted that while Siemens disclosed a "hockey goalie protector comprised of a rigid frame," their chest protector "is generally made of the same materials as conventional chest protectors and should be flexible enough for comfort." (*Id.*) Similarly, each shoulder guard "may be made of a different material but it too should be flexible for comfort." (*Id.*) In addition, the inventors argued that it would not have been obvious to modify the Siemens protector because hockey goalies generally remain standing and wear their protective gear for most of the game, whereas baseball catchers crouch and must be able to quickly and easily take the chest protector on and off several times per game in order to bat. (*Id.*) The PTO subsequently issued the claim as amended.

**D.      TAG's 100 Series and 200 Series Chest Protectors**

Defendant TAG manufactures athletic equipment, including baseball chest protectors, and sells the products to dealers in North America, who turn sell to end users such as high schools. (Answer ¶ 14; Steele Dep., Ex. B to Pl.'s Br., at 11-22.) Trevor Swangard is TAG's president and part owner of the company. (Swangard Dep., at 12-16.) In August 1999, Serewicz and Gallucci showed the prototype of their chest protector to the dealer from whom they bought most of their

_____

[5]      The court notes that although the Siemens patent is titled "Goalie Chest Pad," it discloses a device that incorporates protective coverings not only of the chest, but of the side of the torso, the shoulder, the upper arm, and the forearm. ('993 Patent, col. 4, ll. 30-46.)

Little League equipment; the dealer in turn contacted Swangard. (Serewicz Dep., at 22-23; Gallucci Dep., Ex. 7 to Def.'s Br., at 84-87.) At some point thereafter—Swangard recalls that it was sometime in 2000[6]—Swangard met with the inventors and viewed the prototype. (Swangard Dep., at 116-17.) TAG then manufactured three more prototypes, designed for children of different ages and sizes, for Serewicz and Gallucci to test in the Wasco little league. (Serewicz Aff. ¶ 8.)

At this time and for many years prior, TAG was selling its "100 Series" chest protectors, which, according to Plaintiff, were representative of the "conventional" chest protectors whose disadvantages the inventors noted in the '226 Patent. (Pl.'s Br., at 2; Pl.'s Reply, at 10.) TAG disagrees with that characterization, and asserts that the 100 Series chest protectors "contain[ed] portions that extended over the shoulder" and that model TBP-116 in particular "includ[ed] shoulder guards" and "protect[ed] the front, top, and back of the catcher's shoulder." (Def.'s Br., at 8 & n.4.) Although this argument is more properly directed to issues of validity that the court need not reach for purposes of claim construction, the court notes that TAG's cited evidence does not appear to support its assertions. Swangard testified in his deposition that the TBP-116 "went over the shoulder," not that it had "shoulder guards," (Swangard Dep., at 102); and in photographs of the TBP-116 submitted by TAG, in which the chest protector is worn by a ten-year-old girl, the top area of her shoulders is covered only because the protector—which appears far too large for the girl's size—has been adjusted so that the shoulder portions of the main pad, which would ordinarily cover only the front of the shoulder, have been drawn up and over her shoulders. (Ex. 13 to Def.'s Br.)

In any event, because "early returns on [Serewicz's and Gallucci's chest protector] seemed to be positive," (Swangard Dep., at 171), TAG on July 14, 2000 entered into a license agreement

---

[6]     Although TAG asserts that Swangard viewed the prototype in September 2000, (Def.'s Br., at 8), TAG's citations to Swangard's affidavit and deposition testimony do not specify this month; and in any event, it is likely that this occurred much earlier, given that TAG entered into a licensing agreement in July 2000 with respect to Serewicz's and Gallucci's chest protector, and that agreement was signed after Swangard had viewed the prototype.

with EBL in which TAG agreed to pay a royalty for each chest protector, made and sold by TAG, that was covered by the subject matter claimed by the then-pending '226 Patent application. (Licence Agreement, Ex. G to Pl.'s Br.)  TAG referred to these chest protectors in the agreements as the "Saddle Shoulder" model.  (*Id.*)  Swangard explained that he coined the name because the shoulder guards "would sit on the shoulder, much like a saddle would sit on a horse."  (Swangard Dep., at 77-78.)  On October 3, 2001, after the '226 Patent issued, TAG signed an exclusive license agreement to sell "Saddle Shoulder" chest protectors.  (License Agreement, Ex. H to Pl.'s Br.)  TAG sold these chest protectors as the "200 Series," and marked each chest protector with the '226 Patent number.  (Swangard Dep., at 175.)  Until 2004, TAG paid the agreed royalty and submitted royalty reports for sales of the 200 Series chest protector.  (*Id.* at 86.)

Photos of the 200 Series chest protector display a chest protector in which the "shoulder guards" extend up from the main pad and curve over the shoulder, and slightly down over the back of the shoulder, where short vertical straps are attached to each end and to a triangular-shaped leather piece.  (Ex. I to Pl.'s Br.)  Other straps connect the leather piece to the sides of the main pad.  (*Id.*)  When the chest protector is viewed from the side, held up (not worn), the shoulder guards form an inverted "U" shape.  The photographs do not reveal from what material the shoulder guards are made.  TAG asserts that the shoulder guards contained a "preformed plastic U- or J-shaped insert," (Def.'s Br., at 10), but Swangard, to whose deposition testimony TAG cites, states only that the shoulder guard was "preformed," (Swangard Dep., at 78), and that his opinion of the '226 Patent in general was that it disclosed only a "fiber insert J- or U-shaped shoulder."  (*Id.* at 127.)

## E.     Mizuno's "Tsunami" Chest Protector

Mizuno USA, Inc., a sporting goods company, sells high-end chest protectors.  (Swangard Dep., at 66.)  In October 2001, Swangard learned that Mizuno planned to sell a new chest protector, the "Tsunami," for the upcoming 2002 baseball season.  (*Id.* at 176-80.)  Swangard

advised Mizuno that the Tsunami, which incorporated shoulder protectors, was covered by the '226 Patent. (Letter from Swangard to Gallucci and Serewicz of December 18, 2001, Ex. M to Pl's Br.) Mizuno requested a sublicense from TAG so that Javy Lopez,[7] a catcher with the Atlanta Braves, could wear the Tsunami during the 2002 season. (*Id.*) On January 1, 2002, TAG and Mizuno entered into a sublicense agreement in which Mizuno agreed to pay TAG a royalty for chest protectors covered by the '226 Patent, and to mark such products with the '226 Patent number. (Sublicense Agreement, Ex. N to Pl.'s Br., at 2.) Over the next two years, Mizuno paid royalties to TAG, which in turn paid royalties to EBL. (Ex. O to Pl.'s Br.)

Photos of the Tsunami portray a chest protector in which the shoulder guards, like those on TAG's 200 Series, extend up and over the shoulder and slightly down over the back of the shoulder. In a rear view, vertical straps attached to each end of the back of the shoulder guards form a "Y"; other straps run from the bottom of the "Y" to the sides of the main pad. (Ex. P to Pl.'s Br.) Viewed from the side, the shoulder guards maintain a "J" shape when not worn. (*Id.*) The shoulder guards appear to be made from the same material as the main pad, and there is no indication—and TAG does not assert—that the shoulder guards contain a plastic piece.

---

[7] The name Javy Lopez has a particular significance for Chicago Cubs fans. In 1998—a truly magical season in which Kerry Wood struck out twenty Houston Astros, Sammy Sosa challenged Mark McGwire for the single-season home run record, and 41-year-old Gary Gaetti had a career year playing third base—the Cubs earned a wild-card berth in the playoffs and traveled to Atlanta to face the Braves for two games in the first round. The Cubs dropped the first game. In the second game, Cubs starter Kevin Tapani took a 1-0 lead into the ninth inning. With one out in the bottom of the ninth and no one on base, Braves catcher Javy Lopez smacked a line drive home run into the left-field seats, tying the game. The Braves went on to win 2-1, and instead of returning to Wrigley Field with the series tied, the Cubs faced a 2-0 deficit. In a last-ditch attempt to stave off elimination, the Cubs started Kerry Wood in Game 3, though his arm was fatigued. It would be his last pitching performance for some time, as he required "Tommy John surgery" shortly thereafter; and that turned out to be just the first in a long series of elbow, arm, and shoulder troubles for Wood, whose travails have mirrored those of his team ever since.

**F.    TAG's Allegedly Infringing Chest Protectors**

With the licensing agreement between TAG and EBL set to expire on October 3, 2004, Swangard sent a letter to Gallucci on September 29, 2004, informing him that TAG would not renew the agreement because TAG "d[id] not expect additional sales of [the] TAG 'Saddle Shoulder' product for the year 2005." (Letter from Swangard to Gallucci of September 29, 2004, Ex. R to Pl.'s Br.)  The letter also advised Gallucci that Mizuno had declined to renew the sublicense agreement, expiring on October 1, 2004.  (*Id.*)  TAG subsequently discontinued the 200 Series of chest protectors and began selling the 300 Series, which it listed in its catalog as the "Pro Shoulder" model.[8]  (TAG 2005-06 Catalog, Ex. S to Pl.'s BR., at 1.)  The record does not reveal whether Mizuno similarly discontinued the Tsunami and introduced a new model.

TAG, citing to Swangard's deposition, asserts that the 300 Series protectors, unlike the 200 Series, contain no "plastic piece" or "fiber insert" but are made from "memory foam."  (Def.'s Br., at 10 n.6.)  Because of this construction, according to TAG, the 300 Series chest protectors "do not maintain a U or J shape."  (*Id.*)  Some of TAG's photographs indeed support this assertion, as the chest protector is pictured lying on a table with the shoulder guards "spread out" so that the entire device lies flat.  (Ex. 17 to Def.'s Br.)  In photographs taken from the side, however, the shoulder guards do appear to form a "U" shape.  (*Id.*; Ex. U to Pl.'s Br.)

**G.    This Lawsuit**

Plaintiff filed suit on September 23, 2005, alleging that after expiration of the licensing

---

[8]    In support of its argument that TAG's 300 Series chest protectors infringe the '226 Patent, Plaintiff points out that despite the new "Pro Shoulder" designation, the catalog description also refers to the 300 Series as the "Saddle Shoulder."  (*Id.*)  Elsewhere, moreover, the catalog states that the "Pro Shoulder" design is "patented," though TAG does not own any patents or licenses for the accused chest protectors.  (*Id.*; Answer to Interrogatory No. 17, Ex. T to Pl.'s Br.)  In his affidavit, Swangard states that the reference to the "Saddle Shoulder" in TAG's 2005-06 catalog was merely "an inadvertent error."  (Swangard Aff. ¶ 7.)  TAG has not yet provided an explanation for its description of the "Pro Shoulder" as "patented."  Because this issue bears directly on infringement rather than claim construction, the court need not address it here.

agreements, TAG continued to sell chest protectors, in particular the "Pro Shoulder" model, that infringe the '226 Patent.[9]  (Compl. ¶ 16.)  TAG denies that its products infringe, and asserts affirmative defenses including that the '226 patent is invalid, and that the patentees engaged in inequitable conduct before the PTO.  (Answer, at 5-6.)

As discussed in greater detail below, the parties dispute the meaning of a number of claim terms in the '226 patent, in particular the terms "flexible" and "shoulder guard."  The court addresses the disputed claim language below.

## DISCUSSION

### A.    Principles of Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim construction is "the process of giving proper meaning to the claim language," thus defining the scope of the protected invention.  *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) (citations omitted).  Claim construction is a matter of law for the court to determine.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) *aff'd* 517 U.S. 370 (1996).

In its *en banc* opinion in *Phillips*, the Federal Circuit addressed the preferred methodology of claim construction.  A court begins its analysis of disputed claim language by "'looking to the words of the claims themselves . . . .'"  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1312 (quoting in turn *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))).  Claim terms "'are generally given their ordinary and customary meaning,'" as understood by persons skilled in the relevant art at the time of the patent's invention.

---

[9]    Although Plaintiff initially joined Mizuno as a Defendant as well, Mizuno was dismissed by stipulation on December 7, 2005.  *See* Dkt. No. 20.

*Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1583). In other words, the inquiry involves a determination, "from the viewpoint of a person of ordinary skill in the field of the invention," of "how such a person would understand the claim." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337-38 (Fed. Cir. 2006). Thus, to determine the ordinary meaning of a claim term, the court "looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

Those sources are divided into two categories: intrinsic evidence, consisting of the language of the claims, the patent's specification, and the patent's prosecution history, *id.* at 1314-17; and extrinsic evidence, consisting of any evidence external to the patent and its prosecution history, including treatises, technical dictionaries, and witness testimony, *id.* at 1317 (citing *Markman*, 52 F.3d at 908). In *Phillips*, the Federal Circuit emphasized that extrinsic evidence is "'less significant than the intrinsic record'" for purposes of determining the meaning of claim terms, *id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)), and, while often useful in aiding the court's understanding of the technology at issue, must be "considered in the context of the intrinsic evidence." *Id.* at 1319. It is thus well-settled that a court "should look first to the intrinsic evidence . . . ." *Vitronics*, 90 F.3d at 1582.

Within the class of intrinsic evidence, the claim language itself may "provide substantial guidance," as the meaning of claim terms can often be gleaned in light of the context in which those terms are used in the claim at issue, or as used in other claims in the patent. *Phillips*, 415 F.3d at 1314-15. Moreover, as explained in *Phillips*, the ordinary meaning of a claim term will in some cases be "readily apparent even to lay judges"; in that event, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

Apart from the claim language itself, the most important type of intrinsic evidence is the

11

specification, of which the claims are a part. *See id.* at 1315 ("the specification 'is always highly relevant to the claim construction analysis. . . . it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics*, 90 F.3d at 1582); *see also On Demand Machine Corp.,* 442 F.3d at 1337-38 (noting that *Phillips* "stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim"). The specification consists of "a written description of the invention, and of the manner and process of making and using it," a description of "the best mode contemplated by the inventor of carrying out his invention," and, concluding, "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. The inventor must provide a "full" and "exact" description of the claimed invention. *Id.* The specification thus guides a court's "'full understanding of what the inventors actually invented and intended to envelop with the claim[,]'" and "necessarily informs the proper construction of the claims." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted)).

Claim terms therefore "'must be construed so as to be consistent with the specification.'" *Id.* (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)). Accordingly, where the specification reveals a "special definition given to a claim term by a patentee that differs from the meaning it would otherwise possess[,]" that special definition governs. *Id.* Similarly, an "intentional disclaimer, or disavowal, of claim scope," if found in the specification, is "dispositive." *Id.* A court must, however, "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. Thus, the Federal Circuit has cautioned against "importing limitations from the specification into the claims absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007). The "clear disclaimer" requirement is satisfied only by "a clear disclosure that the patentee intended the claims to be limited as shown." *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1334

(Fed. Cir. 2007).  Such a clear disclosure requires "words or expressions of manifest exclusion or restriction . . . ."  *Teleflex, Inc. v. Ficosa North Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002).

In particular, the Federal Circuit has "repeatedly warned against confining the claims" to the specific embodiments, or examples, of the invention that the inventor has provided in the specification.  *Phillips*, 415 F.3d at 1323; *see Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) ("The general rule, of course, is that claims of a patent are not limited to a preferred embodiment, unless by their own language.").  As the court pointed out in *Acumed*, the "preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary."  483 F.3d at 809.  Importantly, this principle generally holds true even where the specification discloses only a single preferred embodiment: the Federal Circuit "ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Phillips*, 415 F.3d at 1323 (citing *Gemstar-TV Guide Intern., Inc. v. Int'l Trade Com'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004)).  The court further addresses this issue—which is the most significant point of dispute between the parties at this time—in greater detail below.

After the specification, the third source of intrinsic evidence is the prosecution history, which consists of the record of proceedings before the Patent and Trademark Office ("PTO") and which may include the prior art cited by the patentee during the examination of the patent.  *Id.* at 1317 (citations omitted).  The prosecution history, if in evidence, "provides evidence of how the PTO and the inventor understood the patent."  *Id.*  Thus, like the specification, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention."  *Id.*  In addition, the prosecution history may reveal "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.* (citing *Vitronics*, 90 F.3d at 1582-83).  The *Phillips* court cautioned, however, that because the prosecution history represents a negotiation between the PTO and the inventor, it "often lacks

the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, the court notes that TAG incorrectly advocates a further step in claim construction methodology: TAG claims that "[b]efore beginning claim construction, 'the scope and content of the prior art [should] be determined.'" (Def.'s Br., at 11 (quoting *Phillips*, 415 F.3d at 1333) (Mayer, J., dissenting) (quoting in turn *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)).) According to TAG, this court "must construe the disputed claim terms in a manner such that they consider the teachings of the prior art at the time the invention was made." (*Id.* (citing *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1044-45 (Fed. Cir. 2000).) To this end, TAG discusses at some length two much older patents for baseball chest protectors: U.S. Patent No. 925,851 (filed 1908), and U.S. Patent No. 3,574,861 (filed 1968). TAG maintains that the court is required to construe the claims of the '226 Patent in light of this—and all other—prior art. (Def.'s Br., at 14, 20.)

TAG's proposed requirement is unsupported by Federal Circuit authority. The quoted sentence from *Phillips* is found in the dissent, not in the majority opinion which set forth, in comprehensive fashion, the preferred methodology of claim construction; and the sentence from *Graham* that is quoted in the dissent does not address claim construction at all, but rather articulates standards for determining whether an invention is obvious. *See Graham*, 383 U.S. at 17. Moreover, the context in which the *Phillips* dissent quotes *Graham* is not an argument in favor of requiring courts to engage in a survey of prior art for claim construction purposes, but an argument against the Federal Circuit's *de novo* standard of review for claim construction.[10] In short, Defendant has taken a sentence from a dissenting opinion out of context and misleadingly presented it as the law.

Similarly, the court in *Arthur A. Collins* noted only that prior art that is not cited by a patentee

---

[10]  The dissent argues, *inter alia*, that because claim construction and obviousness both depended on "underlying factual inquiries," the Federal Circuit should adopt the more deferential standard of review used for obviousness. *See Phillips*, 415 F.3d at 1333-34 (Mayer, J., dissenting).

in the course of applying for a patent "may assist in ascertaining the meaning of a term to a person skilled in the art." 216 F.3d at 1044-45. The court did not hold that district courts "must" construe claim terms in light of prior art, as TAG urges, but rather looked to relevant prior art as an aid in understanding how the term "TST switch" was generally understood in the telephony industry. *Id.* In that sense, the court utilized prior art much like a technical dictionary or other extrinsic evidence; the court imposed no requirement that district courts ascertain the scope of all prior art before even engaging in claim construction. In any event, no such requirement was noted in the explicit methodology, noted above, that the Federal Circuit subsequently articulated in *Phillips*.

With the above principles of claim construction in mind, the court turns to the construction of the disputed terms in the claims of the '226 patent. The parties dispute the meaning of "flexible," "shoulder guard," "back portion," "adjustable straps," and "each adjustable strap attached at one end to the abdomen portion of the main pad and at the other end to the back portion of the shoulder guard."[11] The court addresses each disputed term, beginning with "shoulder guard," which has generated the most significant dispute between the parties.

## B. Shoulder Guard

Plaintiff urges a broad construction of "shoulder guard": "a component that protects the shoulder." (Pl.'s Br., at 13.) Plaintiff maintains that the term is made up of two commonly understood words, and arrives at this construction by noting that one dictionary definition of the verb "guard" is "protect." (*Id.* (citing WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 847 (1996)).) Plaintiff further contends that no limitation of this broad definition is appropriate because the intrinsic

---

[11] TAG has explicitly accepted Plaintiff's proposed construction of three other claim terms: the "shoulder portion," referring to the chest protector's main pad; the "front portion" of the shoulder guard; and the "top portion" of the shoulder guard. (Def.'s Br., at 15-16.) As articulated by Plaintiff, the "shoulder portion" means "the part of the main pad that pertains to the shoulder." (Pl.'s Br., at 14.) The "front portion" is "the foremost part of the shoulder guard that extends from the shoulder portion of the main pad." (*Id.* at 15.) The "top portion" is "the upper part of the shoulder guard that curves over the wearer's shoulder." (*Id.* at 16.)

evidence does not limit the scope of the term; according to Plaintiff, nothing in the specification of the '226 Patent provides any other definition or an intentional disavowal of the term's scope, and the prosecution history does not refer to the term at all.  (*Id.*)

TAG urges a significantly narrower construction: "a U or J shaped plastic or sufficiently rigid, but flexible, material that maintains a U or J shape and that rests on the shoulder of the wearer." (Def.'s Br., at 21.)  TAG is forthright in acknowledging that this construction relies on the description of the preferred embodiment in the '226 Patent.  (*Id.* at 18.)   Indeed, the claim itself does not mention from what material the shoulder guards are made, nor their shape; the guards are merely "flexible"—a term the court addresses below—and "extend[] . . . over the shoulder of a wearer . . . ." ('226 Patent, col. 4, ll. 6-7.)  Plaintiff thus argues that TAG is improperly attempting to limit the scope of a claim term to the preferred embodiment.  TAG acknowledges that the scope of a patent cannot be limited to a *preferred* embodiment, but maintains that where only one embodiment is disclosed in the specification, the claims can—and should—be limited in accordance with that embodiment.  (Def.'s Br. at 12, 18.)  As noted in *Phillips*, however, the Federal Circuit has consistently rejected that proposition.  *See Phillips*, 415 F.3d at 1323.  Indeed, the Federal Circuit has explicitly rejected an argument strikingly similar to the one TAG advances here: in *Teleflex,* where the alleged infringer asserted that "where only one embodiment is disclosed in the specification, claim terms are limited to the embodiment disclosed," the court found "no such rule" in its precedent.  299 F.3d at 1326.

TAG relies primarily on *Toro Co. v. White Consolidated Industries, Inc.*, 199 F.3d 1295 (Fed. Cir. 1999).  In *Toro* and similar cases TAG cites, the Federal Circuit approved importing limitations from a disclosed embodiment not because only one such embodiment was disclosed, but because it was clear from the specification and/or the prosecution history that the patentee intended the invention to be thus limited.  The *Toro* court considered whether a claim that recited a cover "including" a restriction ring should be construed to require attachment of the ring to the cover.  199

F.3d at 1300. The only embodiment disclosed in the specification showed the ring permanently attached to the cover. *Id.* The court adopted this limitation because the specification contained "clear statements of scope": the embodiment listed several advantages of permanent attachment, and the specification described the "unitary structure" between the cover and the ring as "important to the invention." *Id.* at 1301, 1302. Moreover, the Federal Circuit has since explicitly distinguished *Toro* as applying only where the proposed limitation was clearly designated in the specification as "important to the invention." *See, e.g., Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1373 (Fed. Cir. 2003) ("*Toro* is not dispositive here because . . . there is no such statement of importance present in the specification").

The patent in *General American Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 767 (Fed. Cir. 1996), also cited by TAG, concerned a "cryogenic" railcar for transporting frozen foods. The invention utilized carbon dioxide "snow" in an overhead compartment; chilled gas flowed down into the car through a series of holes in the ceiling of the railcar. The claims recited holes "adjacent each of [the railcar's] side walls and end walls." *Id.* at 768. The holes in the allegedly infringing railcar were located along the side walls, but not the end walls, and the endmost hole along each side wall was three feet from the nearest end wall. *Id.* at 768-69. The district court, following a bench trial, nonetheless found infringement by construing "adjacent" broadly enough so that the endmost holes in the infringing railcar were "adjacent" to the end walls. *Id.* at 769. The Federal Circuit disagreed, holding that the invention was limited to railcars with holes along both the side walls and the end walls. *Id.* at 769-70. In doing so, the court noted the claim language itself, which required openings adjacent to "*each of*" the side walls and the end walls, and the specification, which disclosed only one embodiment—a railcar with holes along both the side and end walls. *Id.* at 770 (emphasis in original). The court did not limit the claims simply because only one embodiment was disclosed, however, nor did the court simply use the embodiment to narrow an otherwise broad claim term. Rather, the claim language itself incorporated the limitation, through

the use of the term "each of"; and the embodiment was consistent with that limitation in that no other embodiment was possible in light of the restrictive claim language.

Similarly, in *Honeywell International, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006), the Federal Circuit in a post-*Phillips* decision affirmed the district court's construction of the term "fuel injection system component" as limited to a "fuel filter." Again, the mere fact that only one embodiment was disclosed was not dispositive; rather, the specification repeatedly used language describing a fuel filter as "this invention," and the prior art problem discussed by the patentees in the specification related to leaking fuel filters. *Id.* Thus, the patentees used particular limiting language that led the court to conclude that a fuel filter was "not merely discussed as a preferred embodiment," but that the patentees had explicitly limited the scope of the claims to a fuel filter. *Id.*

This court finds no support in Defendant's cited cases for the proposition that the existence of a single embodiment in itself necessarily limits the scope of claim terms; rather, there must be some other indication that the invention was intended to be limited to a particular embodiment. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (distinguishing cases including *Toro* and *General American Transportation* because "there were specific reasons dictating a narrow claim construction beyond the mere fact that the specification disclosed only a single embodiment or a particular structure"; to wit, "the specification, claim, or prosecution history made clear that the invention was limited to a particular structure"); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1351-52 (Fed. Cir. 2004) (district court improperly construed claim feature based on references to certain limitations in the specification that were "nothing more than disclosures of a preferred embodiment," where "nowhere d[id] the specification indicate that [those limitations were] necessary" to the claimed function). This approach is consistent with the Federal Circuit's discussion of this issue in *Phillips*, which directed courts to consider the purpose behind the disclosed embodiment. There, the court explained that a patent's written specification is aimed

at teaching those skilled in the art to make and use the invention; to that end, the preferred embodiment merely serves as an example of how to practice the invention in a particular case. *Phillips*, 415 F.3d at 1323.  In light of that goal, a court should avoid importing limitations from an embodiment into the claims, unless it is clear that the patentee intended for the claims and the embodiments "to be strictly coextensive."  *Id.*  In other words, an embodiment limits a claim only where a person of ordinary skill in the art would understand the embodiment not to be "merely exemplary in nature," but would view an embodiment as intended to "define the outer limits of the claim . . . . ."  *Id.*; *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306-07 (Fed. Cir. 2006) (citing *Phillips* in rejecting alleged infringer's argument that the scope of a claim term should be limited in accordance with disclosed embodiments, absent any indication that the term was otherwise explicitly defined in the specification).  This concept, in turn, is consistent with the broader role of the specification in general: as noted, it is improper for the specification to impose limitations on the claims absent "a clear disclosure that the patentee intended the claims to be limited," *MBO Laboratories*, 474 F.3d at 1334, through "words or expressions of manifest exclusion or restriction." *Teleflex,* 299 F.3d at 1327.

Here, there is no indication in the specification that the patentees intended the term "shoulder guard" to be limited only to the shoulder guard described in the preferred embodiment, that is, one that is "made of plastic or any other material that is sufficiently rigid to maintain a 'U' or 'J' shape but that is flexible enough for comfort."  ('226 Patent, col. 2, ll. 36-38.)  Nowhere is the particular material used for the shoulder guards, or its ability to form and maintain a particular shape, characterized as "important to the invention."  *Cf. Toro*, 199 F.3d at 1301; *see Altiris*, 318 F.3d at 1373.  Nor does the specification contain any language suggesting that the patentees intended for the preferred embodiment to be "strictly coextensive" with the claim, or for that embodiment to "define the outer limits of the claim."  *Phillips*, 415 F.3d at 1323.  Indeed, the specification hints at the opposite: in summarizing the invention, the patentees stated that the

shoulder guards "*are* of lightweight material, such as the material used for other portions of the chest protector," ('226 Patent, col. 1, ll. 30-32 (emphasis added)), whereas in the preferred embodiment, the shoulder guards are "*preferably* made of plastic" or other sufficiently rigid, yet flexible material. (*Id.* col. 2, ll. 34-35 (emphasis added).) This language suggests that the "plastic" or similar material referred to in the preferred embodiment is indeed provided merely as an example of the shoulder guards' construction.[12]

TAG further argues that the claim should be limited to the preferred embodiment here because only one embodiment of the '226 invention is possible in order to accomplish what TAG asserts as the "goal of the invention": "to keep the chest protector in the correct location to protect the wearer." (Def.'s Sur-reply, at 4-5.) Citing to the patentees' description of the background and summary of the invention, TAG contends that the sole purpose of the '226 chest protector is "to properly position the protector to protect the wearer's shoulders even when the straps are not perfectly adjusted." (*Id.* at 7 (citing '226 Patent, col. 1, ll. 20-22, 39-41).) U- or J-shaped shoulder guards, according to TAG, are the key to serving this purpose and are thus so necessary to the invention that no other embodiment is conceivable. (*Id.*) This argument, however, ignores the other purpose explicitly identified by the patentees: the need to protect the top of the shoulder. Existing chest protectors, the patentees explained, left the top of the shoulder exposed *even when "properly fitted."* ('226 Patent, col. 1, ll.15-17 (emphasis added).) Indeed, the patentees identify this exposure as the primary problem with existing chest protectors; the fact that the existing protectors might sag and expose an even larger portion of the shoulder and chest area, if the straps are not

_____

[12]     Not only does the preferred embodiment section of the specification contain no language suggesting that it is intended to define the invention, but it concludes with the following:
> The invention has been described above in an illustrative manner and it is to be understood that terminology which has been used is intended to be in the nature of description rather than that of limitation. . . . It is therefore understood that within the scope of the appended claim, the invention may be practiced otherwise than as specifically described.

('226 Patent, col. 3, ll.6-15.)

properly adjusted, is an "addition[al]" problem. (*Id.* col. 1, ll. 20-24.) Thus, even if TAG is correct that a U- or J-shaped shoulder guard is necessary to accomplish the goal of proper positioning of the chest protector, the other, and more important, goal of protecting the shoulder—which existing chest protectors did not accomplish even when properly positioned—does not appear to require shoulder guards that have the ability to "maintain" any particular shape. Because other embodiments of the invention—chest protectors whose shoulder guards do not necessarily "maintain a 'U' or 'J' shape"—are therefore conceivable to serve that purpose, TAG's assertion that only one embodiment of the '226 Patent is possible is incorrect. Moreover, where a patent specification "sets forth multiple objectives," claim terms are not required to be construed "'as limited to structures that are capable of achieving all the objectives.'" *Phillips*, 415 F.3d at 1326-27 (quoting *Liebel-Flarsheim*, 358 F.3d at 908).

In sum, TAG has identified nothing in the specification that warrants a departure from the general rule, repeatedly articulated by the Federal Circuit, that claim terms are not to be limited in accordance with the preferred embodiment. TAG's proposed limitations of the claim term "shoulder guard" to plastic or similar construction and the ability to maintain a "U" or "J" shape, are based on language that does not appear "[t]hroughout the entire '226 patent specification," as TAG incorrectly asserts, (Def.'s Sur-reply, at 7), but is disclosed only once, and only in the preferred embodiment. There is simply no indication in the preferred embodiment, or elsewhere in the specification, that the patentees intended their invention to be limited to the chest protector described in the preferred embodiment; nor, in the court's view, would the specification suggest to a person of ordinary skill in the art that a chest protector with a plastic U- or J-shaped shoulder guard is the only possible embodiment of the claimed invention. The court thus declines to adopt Defendant's proposed narrow construction of "shoulder guard," which relies entirely on the description found in the preferred embodiment.

The court thus turns to Plaintiff's proposed construction of the term—"a component that

protects the shoulder." Plaintiff is correct that "shoulder" and "guard" are both words with commonly understood meanings, for which general purpose dictionary definitions are helpful. *See Phillips*, 415 F.3d at 1314; *see also Ormco*, 463 F.3d at 1306-07 & nn.5 & 6 (Fed. Cir. 2006) (noting the *Phillips* court's approval of the use of general purpose dictionaries for determining the ordinary meaning of commonly understood words, and looking to such a dictionary in arriving at the meaning of the claim term "geometry"). Used as a verb, a common definition of "guard" indeed is "protect"; and the court further notes that as a noun, a relevant definition includes "a device, appliance, or attachment that prevents injury, loss, etc." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 847. An interpretation of "shoulder guard" as a device, or "component," that "protects the shoulder" is thus consistent with the meaning of commonly understood words. The court is nevertheless not persuaded that the combination of the two words into the claim term "shoulder guard" creates a term whose meaning to a person of ordinary skill in the art is so "readily apparent" that the court can construe the term merely by applying "the widely accepted meaning of commonly understood words" without any further examination of the intrinsic evidence. *Cf. Phillips*, 415 F.3d at 1314. Instead, in accordance with the methodology articulated in *Phillips*, the court looks to the claims, the specification, and the prosecution history, if any, as well as to relevant extrinsic evidence, for any indication that the term "shoulder guard" has a particular meaning in the art, or that the patentees intended a particular meaning inconsistent with Plaintiff's proposed construction. *See id.* at 1316.

As noted, no explicit definition of "shoulder guard" appears in the claim. Other portions of the claim limit the shoulder guard to one that is "flexible," that "extend[s] from the [] shoulder portion of the main pad over the shoulder of a wearer," and that has "a front portion adjacent to the main pad, a top portion, and a back portion." ('226 Patent, col. 4, ll. 6-10.) Other than in the preferred embodiment, which, as discussed above, does not limit the claims, the specification states, in summarizing the invention, that the shoulder guards "are of lightweight material, such as the

material used for the other portions of the chest protector," and further that "[e]ach shoulder guard should extend just slightly outward of the wearer's shoulder, such that the shoulder is protected but the guard does not interfere with the wearer's throwing motion." (*Id.* col. 1, ll. 30-38.) This language does suggest that the patentees' conception of the term is somewhat limited with respect to the general type of material from which shoulder guards should be made, and with respect to how wide the shoulder guards should be. In the court's view, however, the language does not amount to a "special definition" of the term, nor an "intentional disclaimer, or disavowal, or claim scope" that establishes that the patentees clearly intended to thus limit their claim. *See Phillips*, 415 F.3d at 1316; *see also MBO Laboratories*, 474 F.3d at 1334. In any event, these potential limitations—"lightweight material" and "extend[ing] just slightly outward of the wearer's shoulder"—are not inconsistent with Plaintiff's proposed construction, and TAG has not argued for such limitations here.

Plaintiff likewise is correct that the prosecution history does not reveal any limitation of the term "shoulder guard." In their argument distinguishing their invention from the Siemens hockey goalie equipment, the patentees explained that the Siemens had a "rigid frame," whereas their invention was "flexible enough for comfort." (Amendment, Ex. 11 to Def.'s Br.) In their sole reference to shoulder guards, the patentees noted only that the shoulder guards "may be made of a different material" from the main pad, but should also be "flexible enough for comfort." (*Id.*) There is, therefore, no indication that the patentees limited the scope of the term "shoulder guard" in the course of prosecution, beyond explaining that it should be "flexible"; and the patentees added that term to the claim itself.[13]

---

[13]     In its effort to limit the scope of the term "shoulder guard" to a plastic U- or J-shaped component, TAG also points to the fact that the shoulder guards on Serewicz's prototype chest protector were made of plastic . (Def.'s Sur-reply, at 2-3.) TAG cites no authority holding that an inventor's prototype necessarily limits the scope of a claim term, however, and the court is aware of none.

The court thus finds nothing in the intrinsic evidence of the '226 Patent that would support TAG's proposed construction, nor any narrower construction than that advanced by Plaintiff. Furthermore, the extrinsic evidence appears to favor Plaintiff's position rather than TAG's. As noted above, Plaintiff's construction is consistent with the commonly understood meaning of the words "shoulder" and "guard." Signficantly, Swangard, TAG's president, belived that Mizuno's Tsunami chest protector was covered by the '226 Patent, and Mizuno apparently agreed, as it obtained a sublicense from TAG and paid royalties. But there is no evidence that the shoulder guards on the Tsunami are made from plastic U- or J-shaped pieces, and TAG does not so assert; indeed, the shoulder guards appear to be made from the same material as the main pad. The fact that Swangard and Mizuno both believed that the Tsunami was covered by the '226 Patent suggests that persons of ordinary skill in the art would view a chest protector that lacked plastic U- or J-shaped shoulder guards as nonetheless within the scope of the claim.[14]

Finally, citing the chest protectors disclosed by the older '851 and '861 patents, TAG contends that Plaintiff's proposed construction—"a component that protects the shoulder"— is impermissibly broad because it "would read the asserted claim directly on the prior art." (Def.'s Br., at 20.) As explained above, however, the court is not required at this stage to ascertain the scope of prior art and construe the present claims in light of that art. Indeed, TAG's argument is more properly directed to issues of validity such as obviousness and anticipation; it is premature here. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1346 (Fed. Cir. 1999) (labeling "premature" defendant's effort to "raise[] the specter of invalidity during the claim construction phase"); *BorgWarner, Inc. v.*

---

[14]     Although TAG maintains that any reference to licensed products such as the Tsunami is irrelevant to claim construction, TAG cites only the well-recognized rule that a court may not tailor its claim construction to accommodate allegedly *infringing* products. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006). Plaintiff's reference to licensed products, as evidence of how persons skilled in the art understood the '226 Patent, thus does not implicate this rule and indeed serves as competent extrinsic evidence of how others understood the invention. *See Phillips*, 415 F.3d at 1318.

*New Venture Gear, Inc.*, 237 F. Supp. 2d 919, 949 (N.D. Ill. 2002) (citing *Rhine* and rejecting defendant's argument that the claim must be interpreted so as to avoid invalidity).  Moreover, Plaintiff's proposed construction, when read in light of the rest of the claim, is not as broad as TAG insists: as noted, the "component that protects the shoulder" must also be "flexible," it must "extend[] from the [] shoulder portion of the main pad over the shoulder of a wearer," and it must have "a front portion adjacent to the main pad, a top portion, and a back portion." ('226 Patent, col. 4, ll. 6-10.)  Thus, even if TAG is correct that the '851 and '861 patents also disclose a "component that protects the shoulder"—and the court expresses no opinion on that issue at this time—that fact alone would not necessarily result in the claim of the '226 Patent reading directly on the prior art, rendering the patent invalid.

The court thus accepts Plaintiff's proposed construction of "shoulder guard": "a component that protects the shoulder."

## C.    Flexible

Plaintiff's proposed construction of the word "flexible," as used in the claim element "a flexible shoulder guard," is "capable of being bent or flexed." (Pl.'s Br., at 11.)  Plaintiff contends that "flexible" is a commonly understood word that can simply be construed in light of its dictionary definition: "capable of being bent, usually without breaking; easily bent." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 733.  According to Plaintiff, nothing in the specification or prosecution history of the '226 Patent is inconsistent with this definition.  (Pl.'s Br., at 12.)

TAG's proposed construction of "flexible" is "made of plastic or other material that is able to bend without breaking." (Def.'s Br., at 18.)  TAG relies on the description of the shoulder guards in the preferred embodiment, which, as noted, states that the "flexible" shoulder guards are "preferably made of plastic or any other material that [are] sufficiently rigid to maintain a 'U' or 'J' shape but that [are] flexible enough for comfort." ('226 Patent, col. 2, ll. 31-38.)  TAG also points to the fact that during prosecution, the patentees differentiated their invention from the rigid

Siemens protector for hockey goalies.  (Def.'s Br., at 17.)

The court agrees with Plaintiff that "flexible" is a "commonly understood word[]" with a "widely accepted meaning" that is "readily apparent."  *See Phillips*, 415 F.3d at 1314.  Indeed, the ordinary meaning of "flexible" is so apparent, "even to lay judges," that this appears to be a case in which the court may simply apply that commonly understood meaning, perhaps with the aid only of a dictionary definition.  *Id*; *see also Ormco Corp.*, 463 F.3d at 1306-07 & nn.5 & 6.  Notably, the latter part of TAG's own proposed construction is entirely consistent with that definition, for "able to bend without breaking" is materially indistinguishable from "capable of being bent, usually without breaking."  But the remainder of TAG's proposed construction—"made of plastic or other material" that can bend without breaking—indeed imposes a significant limitation that is far removed from the commonly understood meaning of the term.  To be viable, this proposed limitation must find clear support in the specification.  *MBO Laboratories*, 474 F.3d at 1334; *Teleflex*, 299 F.3d at 1327.

The only support for TAG's proposed construction in the specification, however, appears in the patentees' description of the preferred embodiment.  As explained above, TAG has failed to persuade the court to depart from the general rule that claims are not to be limited in accordance with a preferred embodiment.  Nor does the prosecution history provide any reason to impose the limitation TAG seeks.  As noted, the patentees differentiated their invention from the Siemens invention because the hockey goalie body protector disclosed by that patent was "comprised of a rigid frame," whereas the '226 chest protector was "flexible enough for comfort" and could more easily be taken on and off during a game.  (Amendment, Ex. 11 to Def.'s Br.)  The patentees never used the word "plastic" in this prosecution history; indeed, the patentees merely stated that the shoulder guards "may be made of a different material" from the main pad.  (*Id*.)  By adding the term "flexible" to their claim, the patentees surrendered coverage only of chest protectors that, like the Siemens, were made of a "rigid frame" and were not "flexible."  The patentees thus provided no differentiation with the Siemens protector that could be construed as imposing any further limitation

on the scope of the term "flexible."

The court thus construes "flexible" as "capable of being bent or flexed."

## D.    Back Portion

Plaintiff advances two, essentially identical constructions of "back portion": "the part of the shoulder guard that is opposite the front part of the shoulder guard and that extends over part of the back shoulder," (Pl.'s Br., at 17); and "the part of the shoulder guard that is opposite the front part of the shoulder guard and covers at least a portion of the back of the shoulder."  (Pl.'s Reply, at 11.)  TAG maintains that the proper interpretation of the term is "a part of the shoulder guard that extends from the top portion down a portion of the wearer's back shoulder such that the shoulder is covered."  (Def.'s Br., at 21.)  The court gleans two areas of disagreement from these competing proposals: whether the back portion of the shoulder guard is "opposite" from the "front part"; and the degree to which the back portion extends over, and covers, the shoulder.

Neither the claim nor the specification support the notion that the back portion of the shoulder guard is "opposite" the front portion.  The claim simply discloses a front portion, a top portion, and a back portion; out of the three, only the front portion is further described as "adjacent the main pad."  ('226 Patent, col. 4, ll. 8-9.)  According to the claims, therefore, the back portion is simply the part of the shoulder guard that is not the front portion or the top portion; and given that "front", "top", and "back" are commonly understood words, it is clear merely from the claim language that the back portion is separated from the front portion by the top portion.[15]  Nor does the specification ever use the word "opposite."  The only description of the back portion appears in the preferred embodiment: the back portion is described as "extending from the top portion down a portion of the wearer's back such that the shoulder is covered . . . ."  (*Id.* col. 2, ll. 42-43.)

---

[15]     In addition, as noted, the parties agree that the "front portion" of the shoulder guard is "the foremost part of the shoulder guard that extends from the shoulder portion of the main pad," and the "top portion" is "the upper part of the shoulder guard that curves over the wearer's shoulder."

Indeed, Plaintiff cites only to extrinsic evidence to support its inclusion of the term "opposite": a dictionary definition of "back" that includes "the opposite of front" as one of many definitions. WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 150. Plaintiff thus appears to intend the use of "opposite" merely as an explanation of "back." In the court's view, however, the term "back" is sufficiently within common knowledge that it does not have to be further defined as "opposite" the front; indeed, the meaning of "opposite" likely would itself need to be construed. Moreover, the term "opposite" might in fact function as an additional limitation to the claim, if that term were construed to exclude from coverage all shoulder guards in which the back portion was not directly, and symmetrically, opposite the front portion.[16] The court assumes that Plaintiff does not seek to impose such a limitation on its own claim, and given the lack of explicit support for the term "opposite" in the claim or the specification, the court is disinclined to do so in any event.

The second issue is whether the back portion of the shoulder guard merely "extends over part of the back shoulder" or covers only "a portion of the back of the shoulder," as Plaintiff maintains, or whether it must extend "down a portion of the wearer's back shoulder such that the shoulder is covered," as TAG insists. The parties thus agree that the back portion of the shoulder guard extends over, and covers, a "part" or a "portion" of the rear of the wearer's shoulder; TAG seeks the further limitation the back portion should cover the entire shoulder. This limitation, however, again relies entirely on the description provided in the preferred embodiment; nowhere else does the specification refer to the shoulder being "covered." As discussed above, the court declines to limit the claim to the preferred embodiment.

Moreover, TAG's proposed limitation necessarily depends on a determination of precisely what area of the upper back is deemed the boundary of the "shoulder." The patentees' drawings of the preferred embodiment, for example, depict a shoulder guard that extends over the wearer's

---

[16]     Indeed, TAG asserts that the inclusion of the term "opposite" would necessarily exclude J-shaped shoulder guards. (Def.'s Sur-reply, at 8.)

shoulder and then curves down only slightly. ('226 Patent, fig. 2.) If the term "shoulder" refers to an area that extends significantly down the a wearer's back, then the "back portion" in the drawings covers only a portion of the shoulder, consistent with Plaintiff's construction. For TAG's construction to be consistent with the drawings, the area considered as the "shoulder" would have to be much smaller. TAG, however, makes no effort to establish any particular definition of "shoulder." Plaintiff does attempt to do so with a citation to a treatise of human anatomy; but as TAG points out, it is not clear that persons skilled in the relevant art are likely to consult such materials. In any event, the court need not make an explicit determination of what constitutes a "shoulder" within the meaning of the '226 claim. Plaintiff's construction, in which only a "part" or "portion" of the shoulder is covered, does not depend upon a precise determination of the boundaries of the shoulder area; only TAG's proposed construction, in which the shoulder must be entirely covered, would require such a determination, and TAG's proposed construction again reflects an improper attempt to limit a claim term to the preferred embodiment.

Plaintiff's proposed construction, moreover, is consistent with what the patentees identified in the specification as the primary problem with existing chest protectors: they did not adequately "protect the top portion of the shoulder" from stray baseballs. ('226 Patent, col. 1, ll. 16-17.) The shoulder guards of the '226 chest protector, which purported to alleviate problems with existing chest protectors, do not have to cover the *entire* shoulder in order to address this issue. It appears undisputed that the shoulder guards' top portions protect the top area of the wearer's shoulders, thus accomplishing the invention's primary stated purpose; the extent to which the back portions protrude down the back of the shoulder appears to have little, if any, significance in light of that purpose.

The court thus construes "back portion" as "the part of the shoulder guard that extends from the top portion and covers at least a portion of the back of the shoulder."

E.     **Adjustable Straps**

Plaintiff proposes that the claim term "adjustable straps" be construed as "strips of suitable flexible material that are capable of being changed so that it [sic] fits." (Pl.'s Br., at 18.) It is unclear to what "it" refers; the court assumes that Plaintiff intends "it" to mean either each adjustable strap, or the chest protector itself. TAG offers "narrow strip[s] or band[s] of leather or other material capable of being lengthened or shortened." (Def.'s Br., at 22.) Both parties rely on dictionary definitions. Plaintiff cites to a definition of "adjustable" as "capable of being adjusted"; "adjust" is in turn defined as "to change (something) so that it fits." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 25. For "strap," both parties cite to essentially the same definition: Plaintiff's citation describes "a narrow strip of flexible material, esp. leather, as for fastening or holding things together[,]" *id.* at 1880; and TAG's source describes "a narrow strip or band of leather or other flexible material . . . for binding or securing things." WEBSTER'S NEW WORLD DICTIONARY 1407 (2d ed. 1984). TAG additionally points out that in their description of the preferred embodiment, the patentees explained that the adjustable straps "may be made of leather or other suitable material." ('226 Patent, col. 3, ll. 1-2.)

The parties' citations to dictionary definitions are appropriate. Neither the claim nor the specification either explicitly or implicitly defines "adjustable strap"; and the reference in the preferred embodiment to "leather or other suitable material" does not serve to limit the term, as discussed above, and is consistent with both parties' cited dictionary definitions in any event. Considering the two words separately, Plaintiff's proposed construction of "adjustable" is more in keeping with those definitions: the phrase "capable of being changed so that it fits" is supported directly by the definitions of "adjustable" and "adjust," whereas TAG's proposed phrase "capable of being lengthened or shortened" is somewhat narrower, and does not appear in TAG's cited source. The court thus declines to adopt TAG's version of "adjustable."

TAG's interpretation of "strap" is more in keeping with the specification and the dictionary definitions. Plaintiff's proposal—"strips of suitable flexible material"—omits the references to

"leather" and "narrow" found in both dictionary definitions quoted above.  The court notes, however, that the omission of "leather" is less significant, for even TAG's proposed construction—"leather or other material"—if read literally, means "any material"; and the same is true of the phrase "leather or other suitable material" that appears in the preferred embodiment.  The word "narrow" is a more significant limitation, but one that is consistent with the intrinsic evidence, for the straps shown in the patentees' drawings are indeed narrow.  ('226 Patent, figs. 1 &2.)  Given that both parties' cited dictionary definitions use the term "narrow" in defining "strap," and given that this limitation is not inconsistent with the intrinsic evidence, the court does not find the use of the term to be inappropriate.[17]

The court thus construes "adjustable straps" as "narrow strips of leather or other suitable flexible material that are capable of being changed so that the chest protector fits."

**F.      Each Adjustable Strap Attached at One End to the Abdomen Portion of the Main Pad and at the Other End to the Back Portion of the Shoulder Guard**

The final disputed claim term pertains to how the straps are attached to the chest protector, as disclosed by the phrase "each adjustable strap attached at one end to the abdomen portion of the main pad and at the other end to the back portion of the shoulder guard."  Plaintiff seeks a construction of this phrase in which "the straps are attached to the abdomen portion of the main pad and back portion of the shoulder guard either directly or indirectly through the other strap."  (Pl.'s Br., at 19.)  Plaintiff's concern is that the claim language suggests that each strap must be attached directly from the abdomen portion of the main pad, on one end of the strap, to the shoulder guard, at the other end.  In Plaintiff's view, the claim should also contemplate a system in which one set of straps, attached to each side of the abdomen section of the main pad, run more or less

_____

[17]      The dispute over the meaning of "adjustable straps" is likely much ado about nothing.  As TAG points out, both Serewicz and Gallucci testified in their depositions that adjustable straps were used on existing chest protectors, (Serewicz Dep., at 44-45; Gallucci Dep., at 78); and it does not appear that Plaintiff intends to argue that the straps in the '226 chest protector were somehow novel, or that the patentees invented any particular kind of adjustable strap.

horizontally to a connector near the center of the wearer's back; a second, Y-shaped vertical strap runs up from the connector, with each leg of the "Y" attached to the back of each shoulder guard. Hence, the connection between the main pad and the shoulder guards is made via the connector and is thus "indirect." (*Id.*) This type of strap arrangement, according to Plaintiff, is what is portrayed in the inventors' drawings and what was used on TAG's 200 Series chest protectors and Mizuno's Tsunami protectors. An interpretation that requires a direct connection, Plaintiff maintains, would thus improperly exclude both the preferred embodiment, and the licensed products, from the scope of the '226 Patent. (Pl.'s Reply, at 13.)

TAG does not offer its own proposed construction; instead, TAG contends that the identified claim language need not be construed by the court at all. (Def.'s Br., at 23.) In TAG's view, the language is "easily understood" as is, and Plaintiff's proposal "would merely serve to confuse a jury." (*Id.*) Citing no authority, TAG maintains that the court is not required to "construe each and every claim term or phrase merely because one side or the other requests a construction." (Def.'s Sur-reply, at 9.)

TAG is correct that as a general matter, only claim language that is disputed or in controversy need be construed by the court. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311 (Fed. Cir. 2005) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) & *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). The court is unaware, however, of any authority holding that one party can avoid a claim construction that is sought by the other party, simply by declining to argue its merits or to offer an alternative proposal. Indeed, a court must often interpret claims that are not in dispute at all, simply "to provide a proper context for the discussion of the terms that are in dispute." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1353 (Fed. Cir. 2003).

More importantly, Plaintiff has sufficiently established that the identified claim language is in controversy. In the court's view, the most "easily understood" interpretation of the language

indeed is that the patent covers only chest protectors in which each adjustable strap runs directly from the main pad to a shoulder guard. This would exclude the patentees' example of their invention, as represented by their drawings depicting the preferred embodiment, from the scope of the patent. It is well-settled that claims should be interpreted to cover the preferred embodiment; while it is improper to *limit* claims in accordance with that embodiment, as discussed above, it is further inappropriate to interpret a claim term so as to *exclude* the preferred embodiment. *See Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("While we are mindful that we cannot import limitations from the preferred embodiments into the claim, we also should not normally interpret a claim term to exclude a preferred embodiment."); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct.'") (quoting *Vitronics*, 90 F.3d at 1583); *see also Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.").

Moreover, as noted above, the licensed products—the TAG 200 Series and the Mizuno Tsunami—serve as extrinsic evidence of how others skilled in the art understood the scope of the '226 Patent. Swangard and Mizuno apparently believed that these products were covered by the '226 Patent, and given that both models employed the indirect strap system detailed above, it is reasonable to conclude that persons skilled in the art would have interpreted the claim language as covering chest protectors using that strap arrangement. This extrinsic evidence, combined with the intrinsic evidence provided by the drawings of the preferred embodiment, is sufficient to support Plaintiff's proposed construction.

The court finds Plaintiff's choice of language less helpful, however. Specifically, it may be confusing to state that the "straps are attached . . . directly or indirectly *through the other strap*." For there to be an "other" strap, a first strap (singular) must be identified. In the court's view,

"another strap" is preferable to "the other strap," and is consistent with the intrinsic and extrinsic evidence noted above. The court thus concludes that the phrase "each adjustable strap attached at one end to the abdomen portion of the main pad and at the other end to the back portion of the shoulder guard" shall be construed as "each strap is attached to the abdomen portion of the main pad and back portion of the shoulder guard either directly, or indirectly through another strap."

## **CONCLUSION**

Claim terms in the '226 Patent are to be construed in accordance with the foregoing.

ENTER:

Dated: September 4, 2007

_____
REBECCA R. PALLMEYER
United States District Judge